# STATE OF MICHIGAN

# COURT OF APPEALS

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

TODD ALLEN WHEELER,

        Defendant-Appellant.

UNPUBLISHED
April 24, 2018

No. 327634
Kent Circuit Court
LC No. 14-010346-FH

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

HOOPER JACKSON PARSLEY,

        Defendant-Appellant.

No. 327924
Kent Circuit Court
LC No. 14-010337-FH

---

ON REMAND

Before: SERVITTO, P.J., and MARKEY and GLEICHER, JJ.

PER CURIAM.

In these consolidated appeals, defendants appeal as of right their jury trial convictions, which were entered after a joint trial. In Docket No. 327634 defendant, Todd Allen Wheeler, was convicted of three counts of third-degree criminal sexual conduct (two counts of penis-vaginal penetration knowing or having reason to know that the victim is mentally incapable or mentally incapacitated and one count of penis-oral penetration knowing or having reason to know that the victim is mentally incapable or mentally incapacitated), MCL 750.520d(1)(c). Wheeler was sentenced as a second-offense habitual offender, MCL 769.10, to 14 to 22 years, 6 months' imprisonment on each count, with the sentences to run concurrently.

In Docket No. 327924 defendant, Hooper Jackson Parsley, was convicted of three counts of third-degree criminal sexual conduct (one count of penis-vaginal penetration knowing or having reason to know that the victim is mentally incapable or mentally incapacitated, one count

-1-

of penis-oral penetration knowing or having reason to know that the victim is mentally incapable or mentally incapacitated, and one count of penis-anal penetration knowing or having reason to know that the victim is mentally incapable or mentally incapacitated), MCL 750.520d(1)(c). Parsley was sentenced as a repeat criminal sexual conduct offender, MCL 750.520f, and a fourth-offense habitual offender, MCL 769.12, to 14 to 30 years' imprisonment on each count, with the sentences to run concurrently.

We affirm in both cases.

## I. BACKGROUND

These cases involve separate criminal sexual conduct charges lodged against each defendant for engaging in sexual relationships, each with a separate 18-year-old special education high school students. Wheeler rented a room from Parsley and resided in Parsley's home. Wheeler is also the father of one of the alleged victims, S.W., who was involved in a sexual relationship with Parsley. S.W. resided with her grandparents. The other alleged victim, E.S., had been friends with S.W. for years and the two attended school together. E.S. was involved in a sexual relationship with Wheeler. The individual sexual relationships began in September 2014, after both young women had attained 18 years of age. Defendants and the young women began their interactions by spending time at Parsley's home, and engaged in typical dating activities such as going to restaurants, shopping, and various community excursions. Although each defendant was charged separately for crimes relating to separate victims on unspecified dates, and each had a separate preliminary examination, at some point the trial court (sua sponte) determined that the matters would be tried jointly. Parsley's counsel moved to sever the trials but the trial court denied the motion indicating that it saw no reason to do so. At the conclusion of the trial before a single jury, defendants were each convicted of three counts of third degree criminal sexual conduct (CSC III), as indicated above.

On appeal, both defendants claimed there was insufficient evidence to support their convictions and in Docket No. 327924, Parsley additionally argued that the trial court erred in denying his pre-trial motion to sever the trials. *People v Wheeler*, unpublished per curiam opinion of the Court of Appeals, issued September 20, 2106 (Docket Nos. 327634; 327924). We determined that there was sufficient evidence to support defendants' convictions but found that joinder of their trials was improper under MCR 6.121. *Id*. at slip op. page 7. Thus, in Docket No. 327634, we affirmed defendant Wheeler's conviction, and in Docket No. 327924, we reversed defendant Parsley's conviction because the trial court erred as matter of law in joining his and Wheeler's charges for trial, and we remanded for a new, separate trial. *Id*. at slip op. page 8.

The Michigan Supreme Court remanded the consolidated cases to this Court. In Docket No. 327634, the Supreme Court directed us to "address the defendant's claim, raised for the first time in this Court, that his appellate counsel was ineffective for failing to challenge on appeal: (1) the joinder of his and Hooper Jackson Parsley's trials; and (2) his trial counsel's ineffectiveness for failing to oppose that joinder." *People v Wheeler*, 500 Mich 1032; 897 NW2d 742 (2017). The Supreme Court directed that this Court should retain jurisdiction and first remand the matter to the trial court to conduct an evidentiary hearing to determine whether the defendant was deprived of his right to the effective assistance of trial and appellate counsel,

and then, after conclusion of the circuit court remand proceeding, to address the ineffective assistance of counsel claims raised by defendant Wheeler. *Id*.

In Docket No. 327924, our Supreme Court vacated "that part of the judgment of the Court of Appeals reversing, without a showing of prejudice, the defendant's convictions because the trial court erred by joining his case with Todd Allen Wheeler's case for trial." *People v Parsley*, 500 Mich 1033; 897 NW2d 742 (2017). Our Supreme Court remanded the case to this Court for consideration of whether the error in joining Parsley and Wheeler's trials was harmless. *Id*.

In Docket No. 327634, this Court, pursuant to our Supreme Court's instruction and order, remanded Wheeler's case to the trial court to appoint counsel to represent Wheeler and to conduct a *Ginther*[1] hearing "to determine whether defendant was deprived of his right to the effective assistance of trial and appellate counsel." The trial court proceedings in Docket No. 327634 have now been concluded and supplemental briefs in both cases have been filed pursuant to orders of this Court. See, *People v Parsley*, unpublished order of the Court of Appeals, entered September 20, 2017 (Docket No. 327924); *People v Wheeler*, unpublished order of the Court of Appeals, entered December 28, 2017 (Docket No. 327634). Based on this Court's ruling and our Supreme Court's directives, the more logical progression is to begin our analysis with Parsley's remand, followed by Wheeler's.

## II. DOCKET NO. 327924

This Court has determined that the trial court erred in failing to sever Parsley's trial from that of Wheeler. *Wheeler*, unpub op at 8. Our Supreme Court has implicitly concurred with this decision by vacating only the portion of this Court's judgment reversing Parsley's convictions "without a showing a prejudice," and by remanding the matter to this Court for consideration of "whether the error in joining [the] trials was harmless." *Parsley*, 500 Mich at 1033.

In accordance with MCL 769.26:

> No judgment or verdict shall be set aside or reversed or a new trial be granted by any court of this state in any criminal case, on the ground of misdirection of the jury, or the improper admission or rejection of evidence, or for error as to any matter of pleading or procedure, unless in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice.

Our Supreme Court has interpreted and explained this provision as follows:

> Section 26 places the burden on the defendant to demonstrate that "after an examination of the entire cause, it shall affirmatively appear that the error asserted has resulted in a miscarriage of justice." [R]eversal is only required if

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

such an error is prejudicial and that the appropriate inquiry "focuses on the nature of the error and assesses its effect in light of the weight and strength of the untainted evidence." The object of this inquiry is to determine if it affirmatively appears that the error asserted "undermine[s] the reliability of the verdict." In other words, the effect of the error is evaluated by assessing it in the context of the untainted evidence to determine whether it is more probable than not that a different outcome would have resulted without the error. Therefore, the bottom line is that § 26 presumes that a preserved, nonconstitutional error is not a ground for reversal unless "after an examination of the entire cause, it shall affirmatively appear" that it is more probable than not that the error was outcome determinative. [*People v Lukity*, 460 Mich 484, 495-496; 596 NW2d 607 (citations and footnotes omitted).]

Thus, in making such a "determination, the reviewing court should focus on the nature of the error in light of the weight and strength of the untainted evidence." *People v Lyles*, 501 Mich 107, 118; 905 NW2d 199 (2017), quoting *People v Elston*, 462 Mich 751, 766; 614 NW2d 595 (2000).

There were several issues of concern as a result of joining Parsley and Wheeler's trials. Many of the trial witnesses testified about both alleged victims simultaneously, often making it confusing when determining which individual they were discussing. Further, during closing arguments, the prosecutor made statements implying that a degree of complicity existed between Parsley and Wheeler, despite Parsley's avowal that he did not discuss the relationship between him and S.W. with Wheeler, and the absence of any charge of conspiracy. For instance, the prosecutor stated:

So I think it's obvious that there would be some sort of communication between these two men who lived together, who trust each other to be in each other's homes. Obviously, Mr. Parsley trusted that rent would be paid. Mr. Wheeler trusted that he could bring his daughter over into that home. So there's obviously a relationship between these two men. And, so the logical conclusion that you can draw is that at some point, either the two of them together, or all four of them had some communication together, in order to discuss likes, dislikes, you know. I mean, just anything that you could probably think of that roommates would be talking about, especially when their girlfriends were over. I'm using that term loosely.

* * *

We know that they all spent some sort of time together. Whether it was between June and September or from the middle of August through about the middle of September, time was spent. Time was spent between each of the defendants and each of the victims in this case, way more than any of us have spent.

It is also impossible in retrospect to fully ascertain the effect of the testimony elicited from E.S. and others pertaining to E.S. during the trial and whether the jury was able to fully

-4-

compartmentalize the information being received from that relating to S.W. In addition, while instructing the jury at the conclusion of the trial, the trial court did not include a generalized instruction to emphasize that the charges against each defendant were to be treated or evaluated separately.

We acknowledge that while these issues are concerning, they do not necessarily dictate the result on remand based on the recognition that "incidental spillover prejudice . . . is almost inevitable in a multi-defendant trial[.]" *People v Hana*, 447 Mich 325, 349; 524 NW2d 682 (1994), amended 447 Mich 1203 (1994). Rather, in ascertaining whether the erroneous joinder was harmless, the focus must be on the "untainted" evidence and whether "in the context of the untainted evidence . . . it is more probable than not that a different outcome would have resulted without the error." *Lukity*, 460 Mich at 495-596.

Parsley was charged with three counts of CSC-III, contrary to MCL 750.520d(1)(c), which states:

> (1) A person is guilty of criminal sexual conduct in the third degree if the person engages in sexual penetration with another person and if any of the following circumstances exist:
>
> * * *
>
> (c) The actor knows or has reason to know that the victim is mentally incapable, mentally incapacitated, or physically helpless.

The term "mentally incapable" is defined by MCL 750.520a(j) to mean "that a person suffers from a mental disease or defect that renders that person temporarily or permanently incapable of appraising the nature of his or her conduct." This Court has held that the statutory definition of "mentally incapable" encompasses "not only an understanding of the physical act but also an appreciation of the nonphysical factors, including the moral quality of the act, that accompany such an act," because this interpretation is supportive of "this Court's prior indications that the rationale behind the statutes prohibiting sexual relations with a mentally incapable person is that such a person is presumed to be incapable of truly consenting to the sexual act." *People v Breck*, 230 Mich App 450, 455; 584 NW2d 602 (1998). Because it is undisputed that sexual conduct between Parsley and S.W. occurred on at least three occasions, and both maintain that the conduct was voluntary, the evidence at trial focused on whether: (1) S.W. had the intellectual capacity to consent to engage in the sexual acts, and (2) Parsley knew or had reason to know of S.W.'s diminished intellectual capacity to consent.

At the time of her sexual encounters with Parsley, S.W. was 18 years old and did not have a guardian. At trial, S.W. testified that she was currently attending and had been enrolled during her entire school career in special education classes, and that she had informed Parsley of this enrollment. She testified that she would sometimes complete homework at Parsley's home, with his assistance. S.W. asserted that she completed a health education class in high school that provided information on sexual matters and that upon turning 18 years of age, she elected to discontinue her use of birth control and to not use protection. S.W. indicated that she is aware

of sexually transmitted diseases, such as AIDS, and that she was not concerned about the possibility of pregnancy.

Nicole Smith, the social worker at the school attended by S.W., reported that S.W. was categorized to be both emotionally and cognitively impaired, demonstrating less mature reactions to events or incidents. S.W. was described by Smith as being strong willed and believing that upon having attained the age of 18, she was no longer governed by any set of rules. Smith opined that S.W. lacked an awareness of the consequences of her actions and would repetitively engage in the same mistakes and behaviors. Smith acknowledged that S.W. was fully capable of conveying her thoughts and wishes.

Jason Maas, S.W.'s school psychologist, asserted that S.W. demonstrated difficulty in the regulation of her emotions and functioned academically at a first grade or second grade level. Although Maas had never administered tests to S.W. or engaged her in a discussion to ascertain her understanding of the repercussions of engaging in sexual acts, he opined that she did not comprehend the consequences of her actions.

Victoria Wilson, a limited licensed psychologist retained by Adult Protective Services (APS), evaluated S.W.'s need for a guardianship. S.W.'s testing resulted in a full-scale IQ range of 63 to 71, and a Vineland Adaptive Behavior Scale score of 69, placing her in the mild range of cognitive and adaptive impairment. Wilson believed that S.W. was capable of following simple two-step directions, but required prompting to routinely engage in daily hygiene and medication compliance. She opined that S.W. demonstrated impulsivity and anger, and would engage in behaviors that would place her at risk.

Parsley denied discussing his relationship with S.W. with her father (Wheeler), denied knowledge of her special education status, and disavowed any knowledge or suspicion of S.W.'s cognitive and adaptive deficiencies based on his interactions with her. When interviewed by police, Parsley admitted his sexual relationship with S.W., asserted his belief she was using birth control, and denied that S.W. had any cognitive challenges or incapacities. Parsley acknowledged his own cognitive deficiencies by relating difficulties he had encountered in high school in being able to pass necessary examinations to join the military, and further asserted his own IQ was 71.

The testimony at trial suggested that S.W.'s ability to make informed and rational decisions was impaired. S.W. was prescribed birth control but upon attaining the age of 18 decided without consultation by medical personnel or others that she would discontinue its use, yet she did not fear pregnancy despite her sexual activity. S.W. expressed an awareness of sexually transmitted diseases but did not suggest that she had discussed this matter with Parsley, her sexual partner, or took precautions for self-protection. Testimony was elicited that S.W. was emotionally unstable and impulsive, and would repeatedly engage in behaviors that entailed risk and did not learn from her previous mistakes, albeit the testimony was not specific in providing examples of the alleged risky behaviors. Further contributing to the suggestion that S.W. was incapable of evaluating her needs, was testimony that she required prompting to engage in the most routine of daily health care tasks. S.W.'s election to discontinue birth control while sexually active, yet not be concerned with pregnancy, comported with Nicole Smith's testimony that S.W. was extremely strong-willed but lacked an awareness of the consequences of her

actions. Although S.W. was opined to be capable of conveying her thoughts and wishes, the testimony implied that she was unable to contextualize her preferences or recognize the risks attributable to her choices.

As discussed in *People v Cox*, 268 Mich App 440, 446; 709 NW2d 152 (2005) (citation omitted), when evaluating the statutory language in MCL 750.520d(1)(c) pertaining to whether the actor "knows or has reason to know that the victim is mentally incapable" and the suggestion that this language was included in the statute in order to "protect[] individuals who have sexual relations with a partner who appears mentally sound, only to find out later that this is not the case," this Court has instead determined that "[t]he Legislature only intended to eliminate liability where the mental defect is not apparent to a reasonable person." Whether S.W.'s abilities were apparent to Parsley is called into question by Parsley's contention regarding his own restricted cognitive abilities and report of a full-scale IQ score that was not that dissimilar from the one attributed to S.W. Evidence, however, was introduced that Parsley's adaptive skills are such that he was able to serve in the army, live independently, and maintain gainful employment for a number of years following his discharge from the army, thereby demonstrating skills that exceed S.W.'s current levels of adaptive performance.

At this level, the dispute is one of credibility, with the jury's verdict indicating that Parsley should have suspected rather than simply accepted S.W.'s consent. The jurors observed S.W. on the witness stand and were able to judge whether her demeanor communicated her deficiencies or made her ability to consent suspect. Questions of credibility are solely within the purview of the jury. *People v Solloway*, 316 Mich App 174, 181-182; 891 NW2d 255 (2016).

In sum, there was abundant "untainted" evidence, independent of Parsley's relationship with Wheeler, to question both S.W.'s ability to consent to engage in a sexual relationship and Parsley's knowledge or reason to know that S.W.'s competency to consent was compromised. To the extent that Parsley's knowledge presented a question of credibility, the jury was charged with making that credibility determination and did so based on the untainted evidence. As such, while joinder of Parsley's and Wheeler's cases comprised error, the error was harmless because it is not more probable than not that the outcome, Parsley's jury convictions, would not have been different without the error.

## III. DOCKET NO. 327634

Our Supreme Court remanded this matter, first requiring the trial court to conduct a *Ginther* hearing, and then requiring this Court to address Wheeler's contentions that his appellate counsel was ineffective for failing to challenge on appeal the joinder of the two cases, and that trial counsel was ineffectiveness for not actively opposing the joinder.

"[T]he test for ineffective assistance of appellate counsel is the same as that applicable to a claim of ineffective assistance of trial counsel. Hence, defendant must show that his appellate counsel's decision not to raise a claim of ineffective assistance of trial counsel fell below an objective standard of reasonableness and prejudiced his appeal." *People v Uphaus*, 278 Mich App 174, 186; 748 NW2d 899 (2008). Defendant must "overcome the presumption that his appellate counsel's decision [to not raise a claim of ineffective assistance of trial counsel] constituted sound strategy." *Id.* Resolution of this issue is contingent, to a significant degree, on

the results and findings of the *Ginther* hearing, wherein the trial court's factual findings are entitled to deference. *People v Grant*, 470 Mich 477, 485 n 5; 684 NW2d 686 (2004). Such deference is afforded because of the trial court's opportunity to assess witness credibility. MCR 2.613(C); *People v Dendel*, 481 Mich 114, 130; 748 NW2d 859, amended 481 Mich 1201 (2008). In addition, the trial court was privy to the full context of the proceedings, having presided over the trial and sentencing. A finding is deemed to be clearly erroneous when, despite supporting evidence, this Court, on the whole record, is left with a definite and firm conviction that a mistake was made. *Id.*

On December 1, 2017, the trial court held a *Ginther* hearing to address Wheeler's claims of ineffective assistance of trial counsel. At the hearing, Wheeler's trial counsel, Donald Pebley, testified that he first became aware that Wheeler and Parsley would be tried together when he got a notice for status conference and trial. Pebley testified that he did not file a motion for severance and, when he became aware that Parsley's counsel filed a motion or severance, did not join in that motion because he did not feel that Wheeler and Parsley's defenses were inconsistent or antagonistic. He testified that, in some ways, he felt that having the cases tried together may be a positive thing because it may show that S.W. and E.S. discussed the relationships and were capable of understanding what they were doing. Pebley further testified that his defense strategy from the beginning, which he discussed with Wheeler, was that E.S. was competent to make a decision whether to have a sexual relationship with Wheeler and that defense did not change after the trial court denied Parsley's motion to sever the trials. Pebley testified that he did not encounter any difficulties pursuing his theory of the case because Wheeler's trial was joined with Parsley's, nor was there any testimony or evidence admitted that he felt negatively impacted Wheeler's case in light of Parsley's case being presented as well. He testified that it "seemed to be identical."

While the qualitative nature of Pebley's election to not challenge the joinder may not have comprised good trial strategy, it does qualify as a trial strategy; albeit not ultimately successful. "That this strategy backfired . . . later . . . does not render counsel's actions unsupportable." *People v Currelley*, 99 Mich App 561, 568; 297 NW2d 924 (1980). With respect to his failure concur in the motion to sever brought by Parsley's trial counsel, because the trial court denied Parsley's motion, Pebley's concurrence would have been futile. The failure of Pebley to file a futile motion cannot be construed to render him ineffective. *People v Brown*, 279 Mich App 116, 142; 755 NW2d 664 (2008).

Moreover, even if Pebley could have established a meritorious basis for severance, to establish prejudice, Wheeler must demonstrate a reasonable probability that the outcome of his trial would have been different but for Pebley's error. *Grant*, 470 Mich at 486.

> A reasonable probability need not rise to the level of making it more likely than not that the outcome would have been different. "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." [*Id*. (citations omitted).]

Similar to the analysis in Parsley, there was abundant "untainted" evidence, independent of Wheeler's relationship with Parsley, to question both E.S.'s ability to consent to engage in a

sexual relationship and Wheeler's knowledge or reason to know that E.S.'s competency to consent was compromised.

Dale Smith, E.S.'s father, testified that E.S. had been in special education for the majority of her academic career and further testified regarding E.S.'s need for constant assistance or prompting to complete routine activities of daily living. Mr. Smith specifically asserted that he informed Wheeler of E.S.'s special education status and testified that he refused to grant Wheeler permission to date E.S. when Wheeler approached him regarding the relationship. Mr. Smith also, however, acknowledged E.S.'s ability to independently use public transportation and a moped, as well as a cellular telephone and a computer tablet, and testified that she had maintained supervised employment for a period of two to three months.

E.S. testified regarding her participation in special education and denied being pressured into have sexual relations with Wheeler. E.S. stated that she specifically waited until she attained 18 years of age before engaging in a sexual relationship with Wheeler and that he informed her of his medical issues of HIV and hepatitis. While E.S., however, asserted that they used a condom for vaginal sex, she did not use any form of protection when engaging in oral sex with Wheeler and did not know what semen was despite asserting a familiarity with what comprised sexually transmitted diseases and a desire to avoid pregnancy.

Nicole Smith confirmed that E.S. is considered to be cognitively impaired and described her as a "follower" and easily manipulated. Jason Maas testified that E.S. is cognitively impaired within the mild range and opined that she is at risk for being taken advantage of and is vulnerable. He further testified that E.S. was incapable of understanding the long-term consequences of her actions. Victoria Wilson tested E.S. and obtained a full-scale IQ score of 67 to 75, confirming her placement within the mild range of cognitive impairment. E.S. was able to comply with or follow simple two-step directions that were concrete but needed prompts to comply with more complex instructions. Wilson recommended the appointment of a partial guardian for E.S. Based on the evidence at trial, it is unlikely that even if Wheeler's trial counsel was ineffective for failing to seek severance that Wheeler would have been acquitted of the charged offenses, particularly given his admission to engaging in the sexual acts with E.S.

The final issue for this Court to address is whether Wheeler's appellate counsel was ineffective for failing to raise the trial court's decision to join, and refusal to sever, the two cases for trial as an issue on appeal. Daniel Rust, Wheeler's appointed appellate counsel, testified at the *Ginther* hearing that he considered the facts that Wheeler and Parsley's cases had been joined for trial and a motion to sever the trials had been denied when preparing an appeal brief on Wheeler's behalf. Rust testified that he did not raise the joint trial as an issue on appeal because Wheeler did not want him to raise the issue. According to Rust, Wheeler stated that he was innocent and did not want a new trial but that the Court of Appels should "dismiss" his case. Wheeler, on the other hand, testified at the *Ginther* hearing that Rust never talked to him about raising the joinder of the trials as an issue on appeal. Wheeler further testified that he wants a new trial.

At the conclusion of the *Ginther* hearing, the trial court opined that he found attorneys Pebley and Rust to be credible witness. The trial court stated that it did not believe Wheeler was a credible witness. The trial court stated that it believed Wheeler to be mentally challenged and

having a propensity "to say whatever he wants to assist his counsel in this matter to try and get this case reversed and remanded either for a new trial or dismissed." The trial court stated that it did not believe that there had been a sufficient showing that Pebley or Rust was ineffective and "[a]ccordingly, you can take it to the Court of Appeals and let them deal with it."

Even if this Court were to find that appellate counsel was ineffective for failing to raise this issue on appeal, that does not conclude our analysis. To establish prejudice, it is incumbent on a defendant to demonstrate that, but for the alleged error of counsel, there is a reasonable probability that the outcome would have been different. Consistent with the analysis of Parsley's claim, to the extent that appellate counsel could have established that joinder of the two cases for trial was improper, this error was harmless. Therefore, Wheeler cannot demonstrate actual prejudice because he is unable to establish "a reasonable probability that the outcome would have been different but for counsel's errors." *Grant*, 470 Mich at 486.

We affirm the convictions in both cases.

/s/ Deborah A. Servitto
/s/ Jane E. Markey
/s/ Elizabeth L. Gleicher